**Dianne KELLEY and Kenneth Hansen, Plaintiff,**

v.

**MICROSOFT CORPORATION, Defendant.**

**No. C07–475MJP.**

United States District Court, W.D. Washington, at Seattle.

Feb. 22, 2008.

Jeffrey M. Thomas, Jeffrey I. Tilden, Mark A. Wilner, Michael Rosenberger, Gordon Tilden Thomas & Cordell LLP, Mark Adam Griffin, Ian S. Birk, William Candler Smart, Keller Rohrback, Seattle, WA, for Plaintiffs.

Charles B. Casper, Montgomery McCracken Walker & Rhoads, Philadelphia, PA, Cassandra L. Kinkead, Charles S. Wright, Stephen M. Rummage, Davis Wright Tremaine, Seattle, WA, for Defendant.

ORDER GRANTING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND GRANTING PLAINTIFFS' MOTION FOR APPLICATION OF WASHINGTON LAW

MARSHA J. PECHMAN, District Judge.

This matter comes before the Court on Plaintiffs' motions for application of Wash-

ington law and for class certification. (Dkt. Nos. 60 & 65.) Defendant filed responses to both motions (Dkt. Nos. 100 & 87) and Plaintiffs have filed replies (Dkt. Nos. 115 & 112). On February 8, 2008, the Court heard oral argument on the motions. (Dkt. No. 127.) Having considered the parties' briefs and all documents submitted in support thereof, and having heard oral argument on the issues, the Court GRANTS Plaintiffs' motion for application of Washington law and GRANTS Plaintiffs' motion for class certification.

### Background

This action challenges two aspects of Microsoft's marketing of its new Windows Vista operating system—the "Windows Vista Capable" program and the "Express Upgrade" program. In early 2006, nearly a year before Microsoft released its new Vista operating system, Microsoft authorized original equipment manufacturers ("OEMs") (i.e., Dell, Sony, etc.) to place a sticker on personal computers ("PCs") indicating that the PCs had been certified by Microsoft as "Windows Vista Capable." (Dkt. No. 29, Second Amended Compl. [hereinafter "Compl."] ¶ 1.2.) (At the time, those PCs were running Microsoft's Windows XP operating system.) In fact, Plaintiffs allege, a large number of the PCs certified as "Windows Vista Capable" can only operate "Vista Home Basic," which does not include any of the enhanced features unique to Vista and which make Vista attractive to customers. In addition, in October 2006, Microsoft offered PC customers an "Express Upgrade Guarantee Program," which purportedly allowed consumers purchasing "Windows Vista Capable" PCs to receive upgrades to Vista for little or no cost. (Compl. ¶ 4.5.) In fact, Plaintiffs allege, the upgrade for many of these customers is only to Vista Home Basic.

Microsoft eventually released four versions of Vista—Basic, Premium, Business, and Ultimate. (Compl. ¶ 4.4.) Plaintiffs allege that it is the Premium version that is the "real" Vista. (*Id.*) Defendant contends that Vista Home Basic, although lacking some of the capabilities of the premium versions of Vista, still provides material improvements over Microsoft's earlier operating system, Windows XP. (Gatchalian Decl. ¶¶ 6–7.) Certain PCs contained a "Premium Ready" sticker that distinguished PCs that could run the premium versions of Vista from the "Windows Vista Capable" PCs.

Plaintiffs allege that Microsoft engaged in deceptive practices to boost holiday sales of personal computers after delaying the release of Vista from March 2006 to early 2007. (Compl. ¶ 4.2–4.3.) Because Microsoft and manufacturers were concerned that consumers looking to buy a new computer would delay their purchases until the release of Vista (and therefore after the holiday season), Microsoft endeavored to assure consumers that their new computers would run the soon-to-be released Vista operating system. Plaintiffs offer evidence suggesting that Microsoft included PCs that could only run Vista Home Basic within the "Windows Vista Capable" marketing program because Microsoft was concerned that few PCs on the market at the time could run the more premium versions of Vista. (*See* Thomas Decl., Ex. A. at 22117, 21978–79, 16845, 23209–10, 19346–62, 25711.) Microsoft did this even though, internally, Microsoft employees expressed concern that consumers would be confused about whether their PCs could run the "real" Vista operating system. (*Id.* at 29335, 40428, 19351.) OEMs and retailers complained to Microsoft that Microsoft had made a mistake when it lowered the "Vista Capable" marketing requirements to include Vista Home Basic. (*Id.* at 40427, 40446–47, 18624.) Plaintiffs allege that Microsoft's assurances that PCs marked "Windows Vista Capable" could run Vista were false and deceptive.

Microsoft, on the other hand, presents evidence showing that Microsoft created, and OEMs and retailers used, marketing materials, sales aids, and training materials that described what features the different Windows Vista editions would provide and explained that not every "Windows Vista Capable" computer would be able to provide every advanced feature available in every edition of Windows Vista, including the new "Aero" interface. For example, a May 18, 2006 Microsoft Press Release explained the differences between "Windows Vista Capable" and "Premium Ready" designations and recom-

mended that customers who want the "best experiences with Windows Vista" purchase Premium Ready PCs. (Burk Decl., Ex. A.) Microsoft's "Get Ready" website explained that a new PC that carries the "Windows Vista Capable" logo can run the "core experiences" of Windows Vista but may not be able to support the premium editions of Windows Vista, including the Aero interface. (Thierren Decl., Ex. A.) Individual OEMs, like Dell, provided information to consumers about the capabilities of various Dell PCs and the differences among Vista editions. (Riquelmy Decl.) And Microsoft prepared informational materials to educate retailers and consumers, including e-mails and point of purchase displays like brochures, fact cards, and monitor blades, that distinguished between "Windows Vista Capable" and "Premium Ready." (Tindall Decl., Exs. A–G.) Microsoft also points to press coverage detailing the differences between "Windows Vista Capable" and "Premium Ready." (Rummage Decl., Ex. A.)

Named plaintiffs Kelley and Hansen both purchased PCs in late 2006 to which a "Windows Vista Capable" sticker was affixed. The PCs they purchased were not labeled "Premium Ready." (Compl.¶¶ 2.1–2.2.) In deposition, Ms. Kelley admitted that she was not aware at the time she purchased her PC that it was labeled "Windows Vista Capable." (Rummage Decl., Ex. D, Kelley Dep. at 42.) She did not rely on the "Windows Vista Capable" designation when she made her purchasing decision. (*Id.*) In contrast, Mr. Hansen stated in his deposition that he ordered his particular computer because "it would handle Vista," and that he was relieved when it arrived and had a "Windows Vista Capable" sticker affixed to it. (*Id.*, Ex. E, Hansen Dep. at 43.) Mr. Hansen testified that he remembers seeing the Windows Vista marketing materials, but only knew to look for the sticker that said "Vista." (*Id.* at 42, 85.) Neither of the Plaintiffs participated in the "Express Upgrade" program.

Plaintiffs' original complaint stated four causes of action. Plaintiffs voluntarily dismissed their breach of contract claim and the Court dismissed Plaintiffs' Magnuson–Moss Warranty Act claim (Dkt. No. 39). Plaintiffs have two remaining causes of action: (1) violation of the Washington Consumer Protection Act or other state consumer protection acts, and (2) unjust enrichment. Plaintiffs now move to certify a class comprised of the following members:

All persons and entities residing in the United States who purchased a personal computer certified by Microsoft as "Windows Vista Capable" and not also bearing the "Premium Ready" designation, and/or all persons and entities residing in the United States who purchased a PC with an "Express Upgrade" to Vista Home Basic. Excluded from this class are: (a) Defendant, any entity in which defendant has a controlling interest or which has a controlling interest in defendant; (b) Defendant's employees, agents, predecessors, successors or assigns; and (c) the judge and staff to whom this case is assigned, and any member of the judge's immediate family.

Plaintiffs also request that the Court apply Washington law to all of the class members' claims.

### Discussion

### I. Conflict/Choice of Law Analysis

Variations in state law affect the Court's analysis of predominance and superiority in regards to certification under Fed.R.Civ.P. 23. *See Castano v. Am. Tobacco Co.*, 84 F.3d 734, 740 (5th Cir.1996). Given the importance of this determination, the Court addresses Plaintiffs' motion for application of Washington law first.

Plaintiffs contend that Washington law, the law of this forum, should apply to their putative nation-wide class action. Defendant responds that the laws of all 50 states are relevant to Plaintiffs' claims. The Court's answer requires a two-step analysis. The Court must determine whether application of Washington law is constitutional, and, if so, whether its application is appropriate under Washington's choice of law rules. *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985).

### A. Constitutionality

Defendant contends that application of Washington law violates its constitutional

rights. The Court agrees with Plaintiffs that application of Washington law does not run afoul of the Constitution.

■ A forum state's substantive law may apply constitutionally in a class action if the forum state has "a 'significant contact or significant aggregation of contacts' to the claims asserted by each member of the plaintiff class." *Shutts*, 472 U.S. at 821–22, 105 S.Ct. 2965 (quoting *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 312–13, 101 S.Ct. 633, 66 L.Ed.2d 521 (1981) (plurality)). The Constitution places only "modest restrictions" on application of a forum's law. *Id.* at 818, 105 S.Ct. 2965. "[I]n order to ensure that the choice of ... law is not arbitrary or unfair," there must be sufficient contacts supporting the state's interest in applying its law. *Id.* at 821–22, 105 S.Ct. 2965. The fairness of applying a forum's law can also be gauged by examining the expectation of the parties. *Id.* at 822, 105 S.Ct. 2965.

■ Application of Washington law does not violate the Constitution. *Cf. id.* (finding application of Kansas law to a class action unconstitutional where 97% of plaintiffs had no ties to Kansas and 99% of the gas leases at issue were unconnected to Kansas, but where defendant conducted business in Kansas). Washington has substantial contacts to the Plaintiffs' claims. Defendant created its allegedly deceptive and unfair marketing scheme in Washington. Defendant is incorporated, does business, and has its principal headquarters in Washington. One of the named plaintiffs is a Washington resident. Further, Defendant contractually required OEMs participating in the allegedly deceptive or unfair scheme to litigate under Washington law. *Id.* at 822, 105 S.Ct. 2965 (stating that expectation of the parties is relevant to determining the fairness in applying the law of the forum state). Defendant's contacts to Washington are significant and not merely "casually or slightly related to the action." *Id.* at 819, 105 S.Ct. 2965. Although the injury to Plaintiffs and the potential class members may have occurred outside of Washington, application of Washington law is not arbitrary, unfair, or unforeseeable. *See id.* at 818–19, 105 S.Ct. 2965.

## B. Choice of Law Analysis Under Washington Law

The parties agree that Washington law governs the choice of law analysis in diversity cases such as this. *See Kohlrautz v. Oilmen Participation Corp.*, 441 F.3d 827, 833 (9th Cir.2006). They disagree as to whether a conflict of laws exists and, if there is a conflict, whether Washington has the "most significant relationship" to the action. *See Johnson v. Spider Staging Corp.*, 87 Wash.2d 577, 580, 555 P.2d 997 (1976) (holding that Washington applies the "most significant relationship" test).

■ Washington employs a two-step approach to choice of law questions. The Court must first determine whether an actual conflict between Washington and other applicable state laws exists. *See Burnside v. Simpson Paper Co.*, 123 Wash.2d 93, 103–04, 864 P.2d 937 (1994); *DP Aviation v. Smiths Indus. Aerospace and Def. Sys. Ltd.*, 268 F.3d 829, 845 (9th Cir.2001) (applying Washington law where no conflict was shown). In the absence of a conflict, Washington law applies. *See Burnside*, 123 Wash.2d at 103–04, 864 P.2d 937. If an actual conflict exists, the Court must determine the forum or fora that have the "most significant relationship" to the action to determine the applicable law. *See Johnson*, 87 Wash.2d at 580, 555 P.2d 997.

### 1. An Actual Conflict Exists

■ Defendant contends that relevant Washington laws conflict with the laws of other states that could apply given Plaintiffs' proposed nation-wide class. Plaintiffs respond that no conflict exists and that the Court should apply Washington law. An "actual conflict" exists "between the laws or interests of Washington and the laws or interests of another state" when the various states' laws could produce different outcomes on the same legal issue. *Erwin v. Cotter Health Ctrs.*, 161 Wash.2d 676, 692, 167 P.3d 1112 (2007).

■ An actual conflict exists between Washington's Consumer Protection Act ("CPA") and Illinois's Consumer Fraud Act. Illinois's Consumer Fraud Act requires a

plaintiff to show that the defendant intended the plaintiff to rely on a misrepresentation, concealment, or deception. *See Avery v. State Farm Mut. Auto. Ins. Co.*, 216 Ill.2d 100, 296 Ill.Dec. 448, 835 N.E.2d 801, 850 (2005). However, the CPA does not require a showing that the defendant specifically intended to make the plaintiff rely on a deceptive or unfair act. *See Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wash.2d 778, 784–85, 719 P.2d 531 (1986). Further, the CPA requires a plaintiff to show that the defendant's actions affected the public interest, but the Illinois Consumer Fraud Act has no such requirement. *Compare Hangman*, 105 Wash.2d at 784–85, 719 P.2d 531 *with Avery*, 296 Ill.Dec. 448, 835 N.E.2d at 850. These variations in state law could change the outcome of Plaintiffs' CPA claim and therefore an actual conflict of laws exists. *See Erwin*, 161 Wash.2d at 692, 167 P.3d 1112.

 Because Plaintiffs seek certification of a nation-wide class, the Court considers the law of all concerned states, i.e., all fifty states. However, the Court need not examine the law of all jurisdictions so long as actual conflict exists between Washington law and the law of one other concerned state. *See Erwin*, 161 Wash.2d at 692, 167 P.3d 1112. Actual conflict exists between Washington and Rhode Island's construction of the law of unjust enrichment. As a general matter, the elements of unjust enrichment "vary from state to state and require individualized proof of causation." *Clay v. Am. Tobacco Co.*, 188 F.R.D. 483, 500 (S.D.Ill.1999). More specifically, Washington bars recovery for unjust enrichment if the plaintiff has an adequate remedy at law, whereas Rhode Island permits overlapping unjust enrichment claims. *Compare Seattle Prof'l Eng'g Employees Ass'n v. Boeing Co.*, 139 Wash.2d 824, 838–39, 991 P.2d 1126 (2000) *with Richmond Square Capital Corp. v. Ins. House*, 744 A.2d 401, 402 (R.I.1999). The varied elements of unjust enrichment and the procedural bar could affect the outcome of the case based on the forum and an actual conflict exists. *See Erwin*, 161 Wash.2d at 692, 167 P.3d 1112.

### 2. Washington Has The Most Significant Relationship To This Action

 If actual conflict exists, Washington law requires application of the law of the forum that has the "most significant relationship" to the action. *See Johnson*, 87 Wash.2d at 580, 555 P.2d 997. In adopting this rule, Washington rejected the rule of *lex loci delicti* (the law of the place where the wrong took place) and adopted the Second Restatement of Law on Conflict of Laws (1971) [hereinafter "Restatement"]. *Id.* at 580, 555 P.2d 997. The "most significant relationship" test requires a two-step inquiry. *See id.* First, the court must determine which state has the most significant relationship to the cause of action. *Id.* (citing Restatement). Second, if the relevant contacts to the cause are balanced, then the court must consider " 'the interests and public policies of potentially concerned states and ... the manner and extent of such policies as they relate to the transaction in issue.' " *Id.* at 582, 555 P.2d 997 (quoting *Potlatch No. 1 Fed. Credit Union v. Kennedy*, 76 Wash.2d 806, 810, 459 P.2d 32 (1969)).

### i. Step One: Washington's Relationship Is Substantial

 Washington relies on the Restatement and Washington case law to determine the relevant contacts a court must consider. A court should not merely "count contacts, but rather ... consider which contacts are most significant and ... determine where these contacts are found." *Johnson*, 87 Wash.2d at 581, 555 P.2d 997 (citation omitted). Both parties agree that the Restatement applies, but Plaintiffs contend section 145 applies, while Defendant relies on section 148. Section 145 sets out the general tort principles, while section 148 elaborates on section 145 with regard to fraud and misrepresentation claims. Consideration of both sections is appropriate, although as Defendant recognizes, the outcome is the same. (*See* Def.'s Opp. to Mot. for App. of WA Law at 9 n. 4.)

Restatement section 145 requires examining:

a) the place where the injury occurred,

b) the place where the conduct causing the injury occurred,

c) the domicil[e], residence, nationality, place of incorporation and place of business of the parties, and

d) the place where the relationship, if any, between parties is centered.

Restatement § 145(2); *Johnson,* 87 Wash.2d at 580–81, 555 P.2d 997. Section 148 requires an examination of:

a) the place, or places, where the plaintiff acted in reliance upon the defendant's representations,

b) the place where the plaintiff received the representations,

c) the place where the defendant made the representations,

d) the domicil[e], residence, nationality, place of incorporation and place of business of the parties,

e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and

f) the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant.

Restatement § 148(2). For both §§ 145 and 148, the contacts are to be evaluated according to their relative importance with respect to the particular issue. Restatement §§ 145(2) & 148 cmt. e.

The place of injury is of lower importance in a case of deceptive trade practices or misrepresentation. The Restatement suggests that "when the place of injury can be said to be fortuitous ... as in the case of fraud and misrepresentation ... there may be little reason in logic or persuasiveness to say that one state rather than another is the place of injury ...." Restatement § 145 cmt. e. In such a case, the state in which the fraudulent conduct arises has a stronger relationship to the action. *Id.* Where the defendant's conduct causes harm in two or more states, the "place where the defendant's conduct occurred will usually be given particular weight in determining the state of the applicable law." *Id.* Here, the Defendant's allegedly unfair or deceptive acts caused injury throughout the country. The location of the harm suffered is fortuitous. *See id.*

■ Under Restatement section 145, the Court finds that Washington has the most significant relationship to this action. First, Plaintiffs' injury occurred throughout the nation if the class is certified, or in Washington and Illinois if no class is certified. *See* Restatement § 145(2)(a). Second, Washington is the location where "the conduct causing the injury occurred;" Defendant developed and launched its allegedly deceptive promotional program in Washington. *See id.* at § 145(2)(b). Third, Washington is the domicile of one of the named Plaintiffs and the Defendant, though if a nation-wide class is certified Plaintiffs will have domicile in all states. *See id.* at § 145(2)(c). Lastly, the parties' relationship is not centered in any particular place because the parties did not contract with one another. *See id.* at § 145(2)(d). Though contacts with all 50 states exist, the Court does not merely count contacts. *See Johnson,* 87 Wash.2d at 581, 555 P.2d 997. Rather, the Court finds that the most significant contacts in the context of Plaintiffs' claims are to Washington, where Defendant resides and created the allegedly unfair or deceptive marketing scheme. Moreover, because the place of injury is fortuitous the Court gives greater weight to Washington, the location of the source of the injury. Restatement § 145 cmt. e.

Restatement section 148's factors recommend the same result. First, Plaintiffs relied on Defendant's alleged misrepresentation in Washington and Illinois, or nation-wide if the class is certified. *See* Restatement § 148(2)(a). Second, Plaintiffs received the misrepresentations in Washington and Illinois, or nation-wide if the class is certified. *See id.* at § 148(2)(b). Third, Defendant originated the allegedly deceptive scheme in Washington. *See id.* at § 148(2)(c). Fourth, Defendant is incorporated and does business in Washington, but the named plaintiffs live in Washington and Illinois and the potential class-members live in all states. *See id.* at § 148(2)(d). Fifth, the location of the "tangible thing which is the subject of the transaction between the parties" is irrelevant. *See id.* at § 148(2)(e). Lastly, no contracts are at

issue. *See id.* at § 148(2)(f). These factors do not persuade the Court to a different outcome from that suggested by section 145.

The Court finds that Washington has the most significant relationship to Plaintiffs' claims. As it must, the Court gives greater weight to the fact that the allegedly deceptive and unfair acts originated in Washington given that the location of the injury is fortuitous. *See* Restatement § 148 cmt. e. Washington has a unique and substantial relationship with Defendant, one of Washington's largest corporate citizens, and the acts complained of by Plaintiffs took place in Washington. *See Johnson,* 87 Wash.2d at 580–84, 555 P.2d 997 (applying Washington law even though plaintiff was a Kansas citizen and suffered an injury in Kansas, where defendant was incorporated in Washington and manufactured the defective product in Washington). The Court will apply Washington law.

### ii. Step Two: Washington Law Applies If The Contacts Are Balanced

■ Assuming, *arguendo,* that the contacts are evenly balanced, Washington law should still apply. When contacts to the relevant fora are evenly balanced, the Court must determine whether "some other state has a greater interest in the determination of a particular issue than the state where the injury occurred." *Johnson,* 87 Wash.2d at 582, 555 P.2d 997 (quoting Restatement § 175 cmt. d). This turns on the purpose of the law and the issues involved. *See id.* When "the primary purpose of the tort rule involved is to deter or punish misconduct [and not merely to compensate the victim for her injuries] ... the state where the conduct took place may ... [have the] most significant relationship." Restatement § 145 cmt. c.

Washington has a paramount interest in applying its law to this action. The CPA targets all unfair trade practices either originating from Washington businesses or harming Washington citizens. Application of the CPA to Plaintiffs' claims effectuates the broad purpose of CPA and its deterrent purpose, especially as applied to one of Washington's most important corporate citizens. *See*

Restatement § 145 cmt. c; RCW 19.86.920. Similarly, unjust enrichment primarily deters misconduct and punishes unfair practice; it is not merely compensatory. *See Bailie Commc'ns, Ltd. v. Trend Bus. Sys., Inc.,* 61 Wash.App. 151, 159–60, 810 P.2d 12 (1991). Washington's interest in applying its unjust enrichment law to Plaintiffs' claim is therefore superior to the interests of other relevant states. *See* Restatement § 145 cmt. c; *Johnson,* 87 Wash.2d at 582, 555 P.2d 997. Application of Washington law to both of Plaintiffs' claims is neither arbitrary nor unjust.

The Court will apply Washington law and consider its application in determining whether a nationwide class may be certified.

### II. Class Certification Standard

■ Class actions are governed by Federal Rule of Civil Procedure 23. The party seeking class certification bears the burden of demonstrating that he or she has met all four requirements in Rule 23(a) and at least one of the requirements of Rule 23(b). *Zinser v. Accufix Research Inst., Inc.,* 253 F.3d 1180, 1186 (9th Cir.2001). Although the trial court has broad discretion in deciding whether to certify a class, the trial court must conduct a "rigorous analysis" to determine whether the party seeking certification has satisfied all the necessary Rule 23 elements. *Id.* To satisfy subsection (a), Plaintiffs must show that (1) the class is so numerous that joinder of all members is impracticable ("numerosity"), (2) there are questions of law or fact common to the class ("commonality"), (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class ("typicality"), and (4) the representative parties will fairly and adequately protect the interests of the class ("adequacy of representation"). Fed.R.Civ.P. 23(a). Plaintiffs must also satisfy one of the elements in subsection (b). Here, Plaintiffs argue that they satisfy (b)(3), which provides as follows:

> the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available meth-

ods for fairly and efficiently adjudicating the controversy. The matters pertinent to the findings include:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against members of the class;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum;

(D) the likely difficulties in managing a class action.

Fed.R.Civ.P. 23(b)(3).

 The parties dispute whether the Court should limit its analysis to the pleadings. In determining whether Plaintiffs have carried their burden, it is clear that the district court may not rule upon the merits of Plaintiffs' claims. *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177–78, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). And in reviewing a motion for class certification, the court generally is bound to accept the substantive allegations in the complaint. *Blackie v. Barrack,* 524 F.2d 891, 901 n. 17 (9th Cir.1975). But the Court may look beyond the pleadings to determine whether the requirements of Rule 23 have been met. *Hanon v. Dataproducts Corp.,* 976 F.2d 497, 509 (9th Cir.1992). In fact, "courts are not only at liberty to but must consider evidence which goes to the requirements of Rule 23 [at the class certification stage] even [if] the evidence may also relate to the underlying merits of the case." *Dukes v. Wal–Mart, Inc.,* 509 F.3d 1168, 1177 n. 2 (9th Cir.2007) (internal quotations and citation omitted); *see also Lozano v. AT & T Wireless Servs., Inc.,* 504 F.3d 718, 728 (9th Cir.2007) (holding that district court properly considered defendant's future litigation strategy in its class certification analysis). Thus, the Court need not, as Plaintiffs suggest, rely solely on the substantive allegations in the complaint, but may consider other evidence presented by the parties in determining whether Plaintiffs have satisfied the elements of Rule 23. *See Manual for Complex Litigation* § 21.14, at 255–56 (4th ed.2004); *Castano,* 84 F.3d at 744 ("A district court certainly may look past the pleadings to determine whether the requirements of rule 23 have been met. Going beyond the pleadings is necessary, as a court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues.").

Plaintiffs also suggest that it would be unfair to consider evidence outside the pleadings because the parties have delayed merits discovery and Plaintiffs filed their motion for class certification at the earliest possible time. But both parties submit volumes of evidence to support their respective positions. The Court will consider the evidence to the extent it is necessary to decide whether Plaintiffs have satisfied Federal Rule 23.

Not all of the Rule 23 elements are at issue here. In terms of the numerosity element, Microsoft has conceded that the class as defined is so numerous that joinder is impracticable.[1] (Dkt. No. 56, Answer ¶ 5.2.) Microsoft also does not dispute that the named plaintiffs will provide adequate representation to the class—the named plaintiffs have no conflicts with the rest of the proposed class and counsel is adequate. And Microsoft has not challenged Plaintiffs' assertion that common questions of law and fact exist. Plaintiffs have identified a number of common issues of fact, including: (1) whether Vista Home Basic fails to provide the new and unique features promoted by Microsoft as being "Vista," (2) whether certifying PCs as "Windows Vista Capable" was unfair or deceptive when the promised "upgrade" from XP fails to perform Vista's most touted functions, (3) whether "capable" in "Windows Vista Capable" would reasonably be construed as meaning capable of running "any" version of Vista, (4) whether the "Windows Vista Capable" certification to consumers was by Microsoft or OEMs, (5) whether Microsoft has been enriched unjustly by increased sales of XP licenses to class members as part of the "Windows Vista Capable" program, (6)

---

1. Microsoft's Rule 30(b)(6) deponent testified that she presumes that Microsoft sold at least one thousand XP Home licenses during the "Windows Vista Capable" program. (Tilden Decl., Ex. M. at 57:7–58:11.)

whether Microsoft has been unjustly enriched by sales of XP licenses to class members who were guaranteed free or reduced-price upgrades to Vista as part of the Express Upgrade program, but who, because the "upgrade" was to Home Basic, must now buy Premium to obtain the "core" Windows Vista experience; and common issues of law, including: (1) whether Microsoft's conduct was unfair or deceptive, occurred in trade or commerce, had a public interest impact, and caused Plaintiffs' injuries, (2) whether Microsoft is liable for treble damages under the Washington CPA as a result of intentional, knowing, or reckless deception of the class, and (3) whether the enrichment Microsoft enjoyed as a result of its conduct was unjust.

Defendant argues that Plaintiffs have not shown typicality, predominance, or superiority.

## III. Typicality

■ Defendant argues that Plaintiffs' claims are not typical of those of the entire class because neither of the named plaintiffs participated in the "Express Upgrade" program. "[A] plaintiff's claims are typical if they arise from the same event or practice or course of conduct that gives rise to the claims of other class members and are based on the same legal or remedial theory." 1 Alba Conte & Herbert Newberg, *Newberg on Class Actions* § 3:19, at 401 (4th ed.2002); *see also Alpern v. UtiliCorp United, Inc.*, 84 F.3d 1525, 1540 (8th Cir.1996) ("[F]actual variations in the individual claims will not normally preclude class certification if the claim arises from the same event or course of conduct as the class claims, and gives rise to the same legal or remedial theory."). "Under the rule's permissive standards, representative claims are 'typical' if they are reasonably coextensive with those of absent class members; they need not be substantially identical." *Dukes*, 509 F.3d at 1184 (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir.1998)).

■ Plaintiffs argue that they may maintain claims on behalf of class members who participated in the "Express Upgrade" program because the "Express Upgrade" program was part of the same overarching mar-

keting program designed to increase sales of "Windows Vista Capable" PC systems immediately before and after the Vista launch. Plaintiffs ask the Court to treat the typicality analysis with too broad a brush stroke. Although Microsoft's "Express Upgrade" program may have been part of its overarching pre-Vista launch marketing campaign, the "Express Upgrade" program and the "Windows Vista Capable" sticker-marketing scheme were materially different. Consumers who purchased "Windows Vista Capable" PCs and consumers who enrolled in the "Express Upgrade" program did not suffer the same alleged injury: all potential class members purchased a "Windows Vista Capable" PC and were allegedly injured by the fact that their PCs will not run the premium versions of Vista, but only the "Express Upgrade" program participants paid for an upgrade to "Vista" that turned out to be only an upgrade to Vista Home Basic. The "Express Upgrade" program participants' injury is correlated to the amount spent on the cost of the upgrade program, not the allegedly inflated price of the "Windows Vista Capable" PCs. Because different types of injuries caused by different courses of conduct are claimed by these two groups, the typicality requirement is not met. *See Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157–58, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982) (holding that claim of an employee who had been denied a promotion for allegedly discriminatory reasons was not typical of a claim for discrimination in hiring for the same reasons).

■ The problem may also be described as one of standing. Indeed, earlier in this litigation, Defendant moved to dismiss Plaintiffs' claims related to the "Express Upgrade" program on standing grounds. (*See* Dkt. No. 12.) At oral argument on that motion, the Court stated that the issue was one of typicality, and reserved decision on the issue until the class certification stage. The Ninth Circuit recently reiterated that standing remains a required threshold issue in class actions. *See Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir.2007). Article III standing requires that plaintiffs show that they suffered an injury in fact, that their injury is fairly traceable to the

challenged conduct, and that their injury is likely to be redressed by a favorable decision. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Here, the named plaintiffs have not suffered any injury resulting from the "Express Upgrade" program, and therefore do not have standing to bring a claim based on that program.

■ The named plaintiffs' claims are typical of those of other class members who purchased "Windows Vista Capable" PCs. But Plaintiffs may not represent a class that includes members who claim injuries based on their participation in the "Express Upgrade" program. However, in lieu of dismissing Plaintiffs' claims based on the "Express Upgrade" program, the Court may create a subclass of members who, in addition to purchasing a PC marked with the "Windows Vista Capable" sticker, also enrolled in the "Express Upgrade" program, as long as one of the named plaintiffs participated in the "Express Upgrade" program. *See* Fed.R.Civ.P. 23(c)(5); *see also Betts v. Reliable Collection Agency, Ltd.,* 659 F.2d 1000, 1005 (9th Cir.1981) (analyzing former Rule 23(b)(4)). The Court grants Plaintiffs leave to amend their complaint to add a named plaintiff who participated in the "Express Upgrade" program. If no such plaintiff is added within thirty (30) days of this order, Plaintiffs' claims based on the "Express Upgrade" program shall be dismissed.

## IV. Predominance

■ Microsoft argues that Plaintiffs cannot satisfy Rule 23(b)(3) because Plaintiffs cannot show that common issues of law and fact predominate over the individual issues in this case. As the Ninth Circuit explained in *Zinser,* "[i]f the main issues in a case require the separate adjudication of each class member's individual claim or defense, a Rule 23(b)(3) action would be inappropriate .... Moreover, when individual rather than common issues predominate, the economy and efficiency of class action treatment are lost and the need for judicial supervision and the risk of confusion are magnified." 253 F.3d at 1189 (quoting 7A Charles A. Wright, Arthur R. Miller and Mary Kay Kane, *Fed-*

*eral Prac. & Proc.* § 1778 at 535–39 (2d ed.1986)). Defendant argues that in light of a recent Washington Supreme Court decision, Plaintiffs cannot show causation under the Washington CPA except through individualized inquiries. Microsoft argues that the individualized factual inquiry necessary for the CPA claim is also necessary to prove the unjust enrichment claim.

For the reasons stated below, the Court concludes that common issues predominate on both Plaintiffs' CPA and unjust enrichment claims. However, the Court narrows and limits the theory on which Plaintiffs may pursue class claims. Plaintiffs may not maintain either cause of action on a deception theory, but may maintain both on a "price inflation" theory.

### A. Consumer Protection Act claim

■ To prevail on their CPA claim, Plaintiffs must show that Microsoft engaged in unfair or deceptive conduct that caused injury to Plaintiffs' business or property, and that the conduct falls within the sphere of trade or commerce and impacts the public interest. *See Hangman Ridge Training Stables v. Safeco Title Ins. Co.,* 105 Wash.2d 778, 792–93, 719 P.2d 531 (1986). Microsoft's argument focuses on the causation element— Microsoft argues that Plaintiffs cannot show that common issues predominate on their Washington CPA claim because under *Indoor Billboard/Washington, Inc. v. Integra Telecom of Wash., Inc.,* 162 Wash.2d 59, 170 P.3d 10 (2007), causation is an inherently individualized inquiry not suited to class treatment.

#### 1. *Indoor Billboard*

*Indoor Billboard* addressed the question of what proof a plaintiff must put forward to establish causation in a Washington CPA claim. The case involved unauthorized surcharges on a phone bill. The Court concluded that the defendant phone company had engaged in an unfair or deceptive act when it labeled the surcharge in a way that suggested to consumers that the surcharge was FCC regulated and required. *Indoor Billboard,* 162 Wash.2d at 78, 170 P.3d 10. One of the questions presented to the Court was

whether plaintiff's evidence on summary judgment—evidence that plaintiff paid the invoices that included the unauthorized surcharges—sufficed to establish a causal link between defendant's unfair act and plaintiff's injury. *Indoor Billboard*, 162 Wash.2d at 78–79, 170 P.3d 10. In holding that evidence of payment alone did not suffice to establish causation, the Court clarified the definition of CPA causation. In cases involving an affirmative misrepresentation of fact, the plaintiff must show that defendant's affirmative misrepresentation proximately caused plaintiff's injury:

> We hold that the proximate cause standard embodied in WPI 15.01 [ [2] ] is required to establish the causation element in a CPA claim. A plaintiff must establish that, but for the defendant's unfair or deceptive practice, the plaintiff would not have suffered an injury.

*Id.* at 83, 170 P.3d 10.

### 2. Effect of *Indoor Billboard* on Plaintiffs' claims

Microsoft argues that under *Indoor Billboard*, Plaintiffs cannot show causation on a class level—instead, Microsoft argues, to find "but for" causation, the trier of fact must consider whether each individual saw the allegedly deceptive sticker and bought a PC that he or she would have not otherwise bought had he or she known that its operating system could not be upgraded to a premium version of Vista. In other words, Plaintiffs must show that Microsoft's allegedly deceptive conduct played a role in Plaintiffs' purchasing decisions, an inquiry that is inherently individualized and fatal to predominance. Plaintiffs argue that Microsoft makes too much of *Indoor Billboard*. They argue that they can meet the "but for" causation requirement—Plaintiffs argue that " 'but for' Microsoft's unfair and deceptive conduct in palming off Home Basic as Vista, neither plaintiffs nor any person who purchased a so-called 'Vista Capable' PC, and thereby paid

for Vista capability, would have suffered any injury." (Plf.'s Reply at 10.)

To decide whether an individualized inquiry is required, the Court must consider Plaintiffs' causation theory. *Cf. Lozano*, 504 F.3d at 728. Defendant believes that Plaintiffs' theory is a deceptive advertising theory—i.e., that Microsoft tricked consumers into purchasing soon-to-be-obsolete PCs on the false promise that those PCs would run Microsoft's new operating system. Many courts have denied class certification where plaintiffs alleged a deception-based theory of consumer fraud. *See, e.g., Oshana v. The Coca–Cola Co.*, 225 F.R.D. 575 (N.D.Ill.2005), *aff'd* 472 F.3d 506 (7th Cir.2006); *Wright v. Fred Hutchinson Cancer Research Ctr.*, 2001 WL 1782714 (W.D.Wash.2001); *Hutson v. Rexall Sundown, Inc.*, 837 So.2d 1090 (Fla. App. 4th Dist.2003). In *Hutson*, the plaintiff alleged that the defendant deceived consumers when it labeled its "softgels" Calcium 900 and Calcium 1200, when those calcium softgels actually only contained 300 and 600 milligrams of calcium, respectively. *Hutson*, 837 So.2d at 1091. Plaintiff claimed that because each pill contained less calcium than was represented, the cost of a daily dose was more than represented and she did not receive the amount of calcium she thought she was receiving. *Id.* Plaintiff brought claims under the Florida Deceptive and Unfair Trade Practices Act and for unjust enrichment and sought to certify a class of consumers who purchased the products believing that each capsule contained a higher dosage of calcium. *Id.* The court held that common issues did not predominate—"an individualized fact inquiry must be made for each class member to determine if he or she read the label and its usage instructions prior to purchase, or otherwise knew how much elemental calcium was contained in each softgel for the product purchased." *Id.* at 1093.

Likewise, in *Oshana*, plaintiffs alleged that the Coca–Cola Company employed an unfair and deceptive marketing scheme that mislead consumers into believing diet Coke from

---

**2.** Washington Jury Pattern Instruction ("WPI") 15.01 states:

The term "proximate cause" means a cause which in a direct sequence [unbroken by any new independent cause,] produces the [injury]

[event] complained of and without which such [injury] [event] would not have happened.

[There may be more than one proximate cause of an [injury] [event].]

the fountain is the same product as diet Coke sold in a can or bottle, even though the recipes are different. The plaintiffs brought claims under the Illinois Consumer Fraud Act ("CFA") and for unjust enrichment and sought a nation-wide class including all individuals who purchased diet Coke from the fountain from 1999 to 2005. *Oshana,* 225 F.R.D. at 578. The Northern District of Illinois concluded that common issues did not predominate in the CFA causation analysis:

> To establish proximate causation, each individual must provide evidence of his or her knowledge of the deceptive acts and purported misstatements. This showing requires an individual analysis of the extent to which Coca–Cola's marketing played a role in each class member's decision to purchase fountain diet Coke. Without determining what each member heard, saw, or knew, it is impossible to assign liability.

*Id.* at 586; *see also Wright,* 2001 WL 1782714 at *3 (denying class certification in Washington CPA action because individual issues, such as whether plaintiffs relied on defendant's allegedly deceptive practices, whether the deceptive practices actually caused injury, and the amount of damages, predominated).

Like in *Oshana* and *Hutson,* a deception-based theory of causation would necessarily require the trier of fact here to determine whether individual class members were actually deceived and whether they would have purchased their PCs but for Microsoft's marketing of them as "Windows Vista Capable." For example, a trier of fact would want to know (1) whether the consumer saw the "Windows Vista Capable" sticker; (2) whether the consumer was aware, through other education or advertising, of the differences between Home Basic and Vista Premium; (3) whether the consumer only wanted Home Basic or was interested in a more sophisticated operating system; and (4) whether the consumer's choice was predominately informed by price. Because an individualized analysis is necessary to determine what role Microsoft's "Windows Vista Capable" marketing program played in each class members' purchasing decision, individualized

issues predominate and class treatment is inappropriate for a CPA claim utilizing a deception-based theory of causation.

■ However, Plaintiffs articulate and focus on another possible theory of causation. Plaintiffs argue that they and all potential class members "paid for Microsoft Vista capability but did not receive it." (Plf.'s Reply at 1.) Using this "price inflation" or "market" theory of causation, Plaintiffs argue that Microsoft artificially inflated demand for computers only capable of running Vista Home Basic, causing Plaintiffs to pay more for those PCs than they would have without the "Windows Vista Capable" campaign. Plaintiffs argue that "Microsoft's unfair and deceptive conduct regarding 'Vista' capability—conduct common to all claims—also created artificial demand, at artificially maintained prices, for PCs that were not truly 'Vista capable' and thus, were rendered less valuable or obsolete upon the release of Vista." (Plf.'s Mot. for Class Cert. at 14; *see also* Compl. ¶ 8.5.) Consumers paid for Vista capability (i.e., the computers were priced higher because of their Vista capability), but allegedly did not receive "real" Vista capability.

Defendants argue that Plaintiffs cannot base their CPA claim on a "price inflation" theory of causation. Indeed, a number of other courts have rejected similar causation theories. *See In re Sears, Roebuck & Co. Tools Mktg. & Sales Practices Litig.,* 2007 WL 4287511, at *9, 2007 U.S. Dist. LEXIS 89349, at *28 (N.D.Ill.2007) (concluding, at class certification stage, that plaintiffs cannot prove causation by relying on proof that consumers paid a premium for Craftsman products as a result of alleged deceptive marketing of the products as "Made in the U.S.A." because "regardless of what prices were paid, it will be necessary to show that each class member purchased the tool and paid the price as a result of defendant's deception"); *Fink v. Ricoh Corp.,* 365 N.J.Super. 520, 839 A.2d 942, 953–66 (2003) (rejecting, in order denying class certification, plaintiffs' "price inflation" theory of causation under New Jersey consumer fraud act because under such theory, injury is too attenuated from deception); *Oliveira v. Amoco Oil Co.,*

201 Ill.2d 134, 267 Ill.Dec. 14, 776 N.E.2d 151, 163–64 (2002) (dismissing consumer protection claim based on theory that defendants' advertisements "artificially inflated" price of gasoline because plaintiff had not alleged that he was actually deceived); *Weinberg v. Sun Co.*, 565 Pa. 612, 618, 777 A.2d 442 (2001) (denying class certification on false advertising claim based on theory that advertising increased sales and price of product because plaintiff must show that he relied on false advertising). But the Court's role at this stage in the litigation is not to decide the merits of Plaintiffs' claims. *See Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974) ("We find nothing in either the language or history of Rule 23 that gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action."); *see also Dukes*, 509 F.3d at 1177–78. And the Court is not convinced that such a theory would be rejected by Washington courts.[3] The Court will allow Plaintiffs to further develop their "price inflation" theory.

Analyzing Plaintiffs' claims through the lens of the "price inflation" theory, common issues predominate. Those common issues, in terms of CPA causation, are whether Vista Home Basic, in truth, can fairly be called "Vista" and whether Microsoft's "Windows Vista Capable" marketing campaign inflated demand market-wide for "Windows Vista Capable" PCs. Plaintiffs have satisfied the predominance element of Rule 23(a).

### B. Unjust Enrichment

In regards to predominance, Plaintiffs' unjust enrichment claim rises and falls on their theory of the case. To prove unjust enrichment, Plaintiffs must show that each class member conferred a benefit on Microsoft "under such circumstances as to make it inequitable for the defendant to retain the benefit without payment of its value." *See Bailie Commc'ns, Ltd. v. Trend Bus. Sys. Inc.*, 61 Wash.App. 151, 159–60, 810 P.2d 12 (1991). In *Bailie*, the Washington Court of Appeals explained that the elements of an unjust enrichment claim in Washington are: (a) a benefit conferred on defendant by the plaintiff; (b) appreciation or knowledge of the benefit; and (c) that retention of the benefit would be unjust under the circumstances. *Id.* at 160, 810 P.2d 12. Plaintiffs argue that unjust enrichment does not require proof of causation and that unjust enrichment is more amenable to common proof because the focus is on the gain to Microsoft rather than the loss to any individual plaintiff. That may be the case, but the trier of fact must still consider whether and how an injustice occurred. If the inequity is that Microsoft deceived consumers, the trier of fact will need to inquire whether Microsoft actually deceived consumers (an individualized inquiry) to determine whether any benefit conferred on Microsoft was unjust. Common issues will not predominate on that type of unjust enrichment claim. *See Oshana*, 225 F.R.D. at 586. But for the same reasons as explained in regards to Plaintiffs' CPA claim, Plaintiffs may maintain an unjust enrichment claim on the theory that Microsoft's marketing campaign artificially inflated the demand for and price of "Windows Vista Capable" PCs. Common issues—whether Microsoft retained a benefit (increased or sustained XP license sales), whether Microsoft knew of that benefit, and whether Plaintiffs paid more than they should have—will predominate.

### V. Superiority

To satisfy Federal Rule 23(b)(3), Plaintiffs must also show that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. Pertinent to that inquiry are the following questions: (a) whether the members of the class are interested in individually controlling the prosecution or defense of separate actions, (b) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class, (c) the desirability or undesirability of concentrating the litigation of the claims in the particular forum, and (d) the difficulties likely to be encountered in the management of a

---

**3.** Neither party has cited, and the Court is not aware of, any Washington cases discussing the viability of the "price inflation" theory in CPA actions.

class action. Fed.R.Civ.P. 23(b)(3). "A consideration of these factors requires the court to focus on the efficiency and economy elements of the class action so that cases allowed under subdivision (b)(3) are those that can be adjudicated most profitably on a representative basis." *Zinser*, 253 F.3d at 1190 (quoting 7A Charles A. Wright, Arthur R. Miller and Mary Kay Kane, *Federal Prac. & Proc.* § 1780 at 562 (2d ed.1986)). Plaintiffs contend, and Microsoft does not dispute, that the first three elements support class treatment. As Plaintiffs point out, individual interest in litigating these claims would be low, the parties are unaware of other litigation over these matters, and the Court is already familiar with Plaintiffs' claims.

But the parties dispute whether class treatment would create difficult management issues. "[W]hen the complexities of class action treatment outweigh the benefits of considering common issues in one trial, class action treatment is not the 'superior' method of adjudication." *Id.* at 1192 (finding that class treatment was not superior where "each class member has to litigate numerous and substantial separate issues to establish his or her right to recover individually"). Because the Court concludes that common issues predominate on Plaintiffs' "price inflation"-based CPA and unjust enrichment claims, the Court concludes that class treatment is manageable and that individual treatment is unrealistic. *See St. Jude*, 2006 U.S. Dist. LEXIS 74797 at *21 ("It is difficult for the Court to imagine how over 11,000 individual consumer fraud cases could be handled effectively against the defendant."). Although the size of the class is potentially very large and class members' damages presumably vary, the Court has limited Plaintiffs' theory such that only a few common liability issues will need to be decided. Given the few common issues to try, class treatment is superior to other methods of adjudication.

## Conclusion

The Court GRANTS Plaintiffs' motion for application of Washington law and GRANTS Plaintiffs' motion for class certification. The Court concludes that class certification is appropriate and Washington law governs the class's claims. The Court limits, however, class membership and the theory on which Plaintiffs may bring their class claims. The named plaintiffs may not represent a class that includes members who claim injuries based on participation in the "Express Upgrade" program, unless they amend their complaint to add a named plaintiff who participated in the program. And Plaintiffs may not bring a Washington Consumer Protection Act or unjust enrichment claim on the theory that Microsoft's deceptive advertising induced consumers to purchase PCs that they would not have otherwise purchased. But Plaintiffs may bring their class claims on a "price inflation" theory, i.e. that Plaintiffs paid more than they would have for their PCs had Microsoft's "Windows Vista Capable" marketing campaign not created artificial demand for and/or increased prices of PCs only capable of running Vista Home Basic.

The Court therefore CERTIFIES a class comprised of the following members:

All persons and entities residing in the United States who purchased a personal computer certified by Microsoft as "Windows Vista Capable" and not also bearing the "Premium Ready" designation.

Excluded from this class are: (a) Defendant, any entity in which defendant has a controlling interest or which has a controlling interest in defendant; (b) Defendant's employees, agents, predecessors, successors or assigns; and (c) the judge and staff to whom this case is assigned, and any member of the judge's immediate family.

The clerk is directed to send copies of this order to all counsel of record.